IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS (BENTON)

FILED

Zachary Chesser,                          )
                                          )
    Plaintiff,                            )
                                          )
    v.                                    )     Case No. 13-456-MJR
                                          )
Henry Rivas, et al.,                      )
                                          )
    Defendants.                           )

MAY 1 3 2013
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON OFFICE

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND MONETARY RELIEF

### I - Introduction

1.    Zachary Chesser brings this complaint against the various
defendants for violating his Constitutional and Satutory religious
rights by preventing him from teaching and learning Arabic,
wearing his pants above his ankles and engaging in personal fasts,
by imposing non-Islamic holiday meals on him, by denying him a
liturgical meal and access to a contract Imam (an Islamic advisor)
with mainstream beliefs, and by only providing a special bag of
free products to him around the time of Christmas; for violating
his Constitutional rights regarding accessing his legal discovery
in order to to file a habeas corpus petition and regarding the
opening of legal mail in his presence; and for violating his
Constitutional rights regarding letters he sent to  the United
States Senate and two e-mails he tried to draft; and for violating
his Constitutional rights by unduly delaying  his communications
with no notification. He requests appropriate declaratory,
injunctive and monetary relief.

### II - Jurisdiction, Venue, Cause of Action and Joinder of Counts

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3.    Venue is proper in this district pursuant to 28 U.S.C.
1391, as all events arose  in this district.

1

4.    Declaratory relief is authorized by 28 U.S.C. §§ 2201,
2202 and Fed. R. Civ. P. 57.

5.    Injunctive relief is authorized by 28 U.S.C. §§ 2283 and
2284.

6.    Constitutional claims are authorized by <u>Bivens v. Six
Unknown Narcotics Agents</u>, 403 U.S. 388 (1971).

7.    This action is brought pursuant to the First and Fifth
Amendments to the United States Constitution and the Religious
Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb-1(c).

8.    Each count in this Complaint is connected to the others,
either by the events which gave rise to them or by the defendants
who are involved. Thus, this Complaint is properly filed as a
single Complaint. See Exhibit A for a visual aid.

III - Parties

Plaintiff:

9.    Zachary Chesser is an adult of sound mind, incarcerated
in the Communications Management Unit ("CMU") at USP Marion.
Address: #76715-083, USP Marion, 4500 Prison Rd, P.O. Box 1000,
Marion, IL 62959.

Defendants:

10.    Henry Rivas is, at all times mentioned herein, the Intel-
ligence Research Specialist ("IRS") for the CMU at USP Marion.
Address: USP Marion, 4500 Prison Rd, P.O. Box 2000, Marion, IL
62959.

11.    Jeffrey Walton is, at all times mentioned herein, the
current Warden at USP Marion. Address: same as above.

12.    Wendy Roal was, at all times mentioned herein, the Warden
at USP Marion prior to Jeffrey Walton. Whenever she is mentioned

as a defendant in her official capacity for injunctive relief, this will refer to Jeffrey Walton, solely for the purpose of injunctive relief. However, Roal will remain the defendant for all other purposes. Last known address: same as above.

13.    Steven Cardona is, at all times mentioned herein, the current Unit Manager of the CMU at USP Marion. Address: same as above.

14.    Paul Kelly was, at all times mentioned herein, the Unit Manager of the CMU at USP Marion prior to Cardona. Last known address: same as above.

15.    Milton Neumann is, at all times mentioned herein, the Case Manager of the CMU at USP Marion. Address: same as above.

16.    Robert Roloff is, at all times mentioned herein, the Supervisory Chaplain at USP Marion. Address: same as above.

17.    McCleary (first name unknown) is, at all times mentioned herein, the Assistant Food Services Director at USP Marion. Address: same as above.

18.    Winn (first name unknown) is, at all times mentioned herein, the Trust Fund Supervisor at USP Marion. Address: same as above.

19.    Leslie Smith is, at all times mentioned herein, the head of the Counterterrorism Unit ("CTU") of the Bureau of Prisons ("BOP"), which employs intelligence analysts to monitor all incoming and outgoing communications in the CMU and oversees many other matters in the CMU. Address: 55 Meridian Parkway, Suite 105/106, Martinsburg, West Virginia 25404.

3

20.     April Cruitt is, at all times mentioend herein, an
intelligence analyst with the CTU. Address: same as above.

21.     T. Capaldo (first name unknown) is, at all times mentioned
herein, an inteligence analyst with the CTU. Address: same as
above.

22.     Stephen Colt is, at all times mentioned herein, an
intelligence analyst with the CTU. Address: same as above.

23.     J. Simmons (first name unknown) is, at all times
mentioned herein, an intelligence analyst with the CTU. Address:
same as above.

24.     All defendants, at all times mentioned herein, acted
under the color of federal law. Each defendant is sued in their
individual and official capacities.

## IV - Factual Allegations

### General Background

25.     There are two CMU's in the BOP. One is in Terre Haute,
Indiana and the other is in Marion, Illinois.

26.     They are units designed to monitor all incoming and
outgoing communications of select inmates, who have engaged in
domestic or international terrorism, who are sexual predators who
have repeatedly tried to contact their victims, who have attempted
to coordinate illegal activities over approved methods of
communication, or who have received repeated write-ups for having
violated BOP communications policies. Some inmates are in the
CMUs for having extensive ties to international terrorism, while
others are in the CMU for matters as small as being suspected of
planning to engage in tax fraud.

27.     The CTU was established in October, 2006, in Martinsburg,

4

West Virginia. It is run by Leslie Smith, and it is responsible for monitoring all communications entering or leaving the CMUs, coordinating foreign language translation services for the BOP, producing intelligence reports on terrorist inmates and other matters. April Cruitt, T. Capaldo, Stephen Colt and J. Simmons are all intelligence analysts at the CTU.

28.     The CMUs are subject to 24/7 audio and video monitoring with plain and hidden devices.

29.     Typically, the CMUs each house around 40 prisoners, of whom usually around 50% or more are Muslims.

30.     Inmates in the CMU are restricted to two fifteen-minute phone calls each week, which must be scheduled one week in advance. Inmates must choose a time for each call and specify which languages they will speak in. Normally, BOP inmates are allowed to place any number of calls each week at their leisure, so long as they do not exceed 300 minutes of conversation time in one month.

31.     Inmates in the CMU have no way of communicating with any of the inmates in the general population.

32.     Inmates in the CMU are allowed out of their cells for an average of fifteen hours each day, just as inmates in general population are.

33.     Mr. Chesser was arrested in July, 2010. In October, 2010, he pled guilty to providing material support to Al-Shabaab in Somalia, soliciting people to leave empty packages in public to tie up law enforcement, and communicating threats against the creators of South Park, a sophomoric television show. On February 26, 2011, he was sentenced to 25 years in prison.

5

34.    On May 2, 2011, Mr. Chesser arrived at the CMU. He received a paper claiming he was being held in the CMU due to extensive ties to Al-Shabaab.

35.    Mr. Chesser is an orthodox Sunni Muslim who follows a comparative approach to deciphering religious jurisprudential questions. In his approach, he leans toward a school of thought known as the Hanbali School. He is very sincere in his adherence to his religion.

36.    In Sunni Islam, there are four major schools of jurisprudence, but these cannot be likened to separate sects. Rather, they deal more with the physical aspects of Islam than the inner and more spiritual aspects. Thus, Muslims of each school attend the services of one another, and they rely on scholarly works from each school to practice their religion. In Mr. Chesser's experience, most Muslims in the BOP seem to follow a comparative approach with an emphasis on the Hanbali school of thought, but many might not be familiar with these terms and would refer to themselves as "Salafis."

37.    There are two main sects attributed to Islam: Sunni and Shi'ah. Around 90% of the world's Muslims are Sunni and almost all Muslims in the BOP are Sunnis. Shi'ah Muslims belonging to the Zaydi sub-sect, largely found in Yemen and Saudi Arabia, are regarded to be closer to Sunnis than to other Shi'ah by themselves, Sunnis and other Shi'ah sects. In fact, Zaydis are often regarded as a fifth school of thought by Sunni scholars, rather than as a sub-sect. Thus, the percentage of the global Muslim population which is made of full-blown Shi'ah is even lower than this figure.

38.    Under the Sunni sect, there are two other main sects:

6

orthodox Muslims and Sufis. Most Sunnis are orthodox. Furthermore, in the BOP, there are disproportionately few Sufis. While there might be many sub-sects which are considered orthodox, such as Salafis, Deobandis, Ikhwanis and more, the differences between them are relatively minor when compared to their differences with non-orthodox sects.

39.    Sufis represent an extremely diverse category wherein the degree of difference between one group and the next is often far more dramatic than those between the various orthodox sects. Actually, many Sufis are nearly indistinguishable from orthodox Muslims in terms of their beliefs and practices. A number of these Sufis, such as Al-Ghazali, 'Abd al-Qadir al-Jilani and Al-Junayd, are among the foremost scholars respected by orthodox Muslims. However, others diverge from orthodox traditions severely with varying degrees of severity. Some of these groups are regarded by orthodox Muslims and the more orthodox Sufis as having strayed into heresies, while others are considered by them to have left the fold of Islam altogether. These more extreme Sufis are almost non-existant in the BOP.

40.    Both Muslims and the BOP regard groups  such as the Nation of Islam and the Moorish Science Temple to be totally distinct religions which are not part of traditional Islam. These religions are related to Islam, only in the same sense that Buddhism is related to Hinduis, i.e., they originated in Islam, but became separate and distinct systems of belief.

## A. - Ban on Arabic

41.    Arabic is the liturgical language of Islam. It is obligatory in Islam to learn Arabic to at least some degree. Some

7

scholars say that it is obligatory on all Muslims to become fluent in Arabic. All Muslim scholars agree that     in certain situations, becoming fluent in Arabic can be obligatory on certain people. Further, all Muslim scholars say that it is at least highly recommended in Islam to learn Arabic fluently.

42.    Many of the non-Arab Muslims in the CMU work to learn the Arabic language for religious reasons. Since arriving at the CMU, Mr. Chesser has constantly worked to learn Arabic, believing it is an obligation upon him.

43.    In or around October, 2012, just prior to her departure from USP Marion, Wendy Roal issued a ban on all teaching and studying of foreign languages in the CMU. Inmates were prohibited from buying any books which could be used to learn a foreign language.

44.    Henry Rivas, Steven Cardona, Robert Roloff, Milton Neumann and Jeffrey Walton all enforced this ban for a few months after Roal's departure. However, eventually they amended this policy to allow inmates to purchase materials to learn a foreign language on their own, on the condition that the materials do not leave their cells. The ban on teaching is still in effect.

45.    This ban was initially justified by the defendants on security grounds. They claimed that inmates communicating with each other in Arabic threatened security, so learning Arabic had to be banned

46.    This ban was only ever intended to prevent inmates from learning Arabic. It was also only ever enforced against those who wanted to learn Arabic. Thus, the policy singled out Muslims in practice, despite its broad official language.

47.     This ban was justified on grounds that it was necessary to prevent inmates from communicating with one another in Arabic, but more than one fourth of CMU inmates are already fluent in Arabic. The CTU also actively translates anything which is necessary to translate without any apparent difficulty. Further, there has never been an incident threatening security caused by a CMU inmate learning Arabic. Therefore, this ban was not reasonably related to the goal of security. This ban was not imposed on the general population either, which is a further indication of the lack of reason behind it.

48.     The later relaxation of this ban also completely refutes the notion that the ban was reasonably related to security. Now, inmates may learn foreign languages on their own, but not with the help of others. Thus, only those inmates who are too poor to afford language-learning materials on their own are still being prevented from learning a foreign language. It is impossible to argue that learning a foreign language threatened security, when just a few months later, the defendants changed their minds and decided it did not threaten security.

49.     It is also impossible to argue that the current ban fur- thers any security interest, because it simply keeps inmates who are too poor to afford learning materials from learning Arabic. It does not keep inmates who are able to afford to learn Arabic from learning it. All this new policy does is discriminate against the poor and slow the progress of the wealthy. It does not further any governmental interest whatsoever.

50.     The past and current ban on teaching Arabic also prevents Mr. Chesser from practicing a sincerely held religious belief.

51.     Mr. Chesser needs a teacher to perfect his pronunciation of Arabic, as Islam obligates certain prayers which must be recited in Arabic with proper pronunciation. Also, the ban irrationally slows his progress in learning grammar, vocabulary and other aspects of the language.

52.     Also, Islam obligates those with religious knowledge to teach it to others. Banning Mr. Chesser from teaching those who are too poor to afford materials to learn from on their own keeps him from being able to fulfill this obligation.

53.     This ban also prevented Mr. Chesser from being able to associate with any individuals who speak foreign languages. Most of the people helping Mr. Chesser's wife, a Ugandan political/religious refugee living in Jordan, only speak Arabic. Also, pending litigation, Mr. Chesser's son is likely to be raised only speaking Arabic. Mr. Chesser is also deprived of being able to consult virtually all major Islamic scholars on religious issues, as very few of them speak English at all, and those who do speak English are usually afraid to communicate with someone like Mr. Chesser, as this can cause them undue pressure from intelligence agencies.

Count I - RFRA

54.     The current policy banning the teaching of Arabic and the possession of Arabic learning materials outside of one's cell substantially burdens Mr. Chesser's ability to exercise a sincerely held religious belief. It neither furthers a compelling governmental interest, nor is it the least restrictive means of doing so. Therefore, Rivas, Walton, Cardona, Neumann and Roloff are violating Mr. Chesser's rights under RFRA.

Counts II and III - Free Exercise

55.    The past ban on learning and teaching Arabic was not
rationally related to a neutral governmental interst, nor did it
offer Mr. Chesser the ability to exercise his beliefs in another
way. It did not relieve any significant burden on governmental
interests. Therefore, Rivas, Roal, Walton, Cardona, Neumann and
Roloff violated his First Amendment Free Exercise rights.

56.    The current ban on teaching Arabic and sharing learning
materials by Rivas, Walton, Cardona, Neumann and Roloff violates
Mr. Chesser's Free Exercise rights for the same reason.

Counts IV and V - Establishment

57.    As the past ban also served to suppress Islam, but not
other religions in the CMU, Rivas, Roal, Walton, Cardona, Neumann
and Roloff violated Mr. Chesser's rights under the Establishment
Clause of the First Amendment.

58.    For the same reasons, Rivas, Walton, Cardona, Neumann and
Roloff continue to violate this right of Mr. Chesser by banning
the teaching of Arabic and the sharing of Arabic learning materi-
als.

Counts VI and VII - Freedom of Association

59.    As the past ban prevented Mr. Chesser from associating
with individuals who do not speak English, Rivas, Roal, Walton,
Cardona, Neumann and Roloff violated Mr. Chesser's First Amend-
ment right to Freedom of Association.

60.    By irrationally inhibiting Mr. Chesser's association with
people who do not speak English, Rivas, Walton, Cardona, Neumann
and Roloff are violating Mr. Chesser's right to Freedom of Associ-
ation with the current ban on teaching Arabic and sharing learning
materials.

Counts VIII and IX - Freedom of Speech

61.    Also, as this past ban was effectively a method of cen-
soring incoming and outgoing speech as well as that which could
occur between inmates in a foreign language, Rivas, Roal, Walton,
Cardona, Neumann and Roloff violated Mr. Chesser's right to
Freedom of Speech under the First Amendment.

62.    As the current ban on teaching foreign languages and
sharing learning materials irrationally hinders Mr. Chesser's
ability to send outgoing communications in foreign languages,
to understand incoming ones in foreign languages and his ability
to communicate in a foreign language with other inmates, Rivas,
Walton, Cardona, Neumann and Roloff are violating his right to
Freedom of Speech under the First Amendment.

Counts X and XI - Equal Protection

63.    As the past ban was designed to prevent only Muslims from
learning a foreign language, and was only implemented against them,
Rivas, Roal, Walton, Cardona, Neumann and Roloff violated Mr.
Chesser's right to Equal Protection as implied by the Fifth Amend-
ment.

64.    As the current ban on teaching Arabic and sharing learning
materials is simply an amended version of the previous ban, Rivas,
Walton, Cardona, Neumann and Roloff are violating Mr. Chesser's
Equal Protection rights with this ban.

Exhaustion

65.    Mr. Chesser has exhausted his administrative remedies.
Exhibits B and C.

### B. - Ban on Shortened Pants

66.    Prior to the arrival of Steven Cardona at the CMU, there

12

was a ban on rolling up one's pant-legs and on having them hemmed.

67.    Mr. Chesser sincerely believes that it is sinful in his religion to wear his pant-legs below his ankles. Thus, this ban completely prevented his ability to practice a sincerely held religious belief.

68.    Henry Rivas, Wendy Roal, Paul Kelly, Milton Neumann and Robert Roloff all implemented this ban against Mr. Chesser.

69.    When Steven Cardona arrived at the CMU, he lifted the ban on having one's pants hemmed, whereupon Mr. Chesser had his pants hemmed. This demonstrates that the ban on wearing one's pants above their ankles was not rationally related to a neutral governmental interest. Common sense would also seem to prove this.

70.    There is actually a BOP-wide ban on hemming one's pants and wearing them above one's ankle. This ban is found under number 5360.09 of the BOP's Program Statement. This section deals with "Religious Beliefs and Practices." After discussing what inmates may wear to religious services, including numerous things which are very much at odds with the BOP's normal uniform, and then discussing a number of prohibited forms of dress (all of which appear in black text), a sentence banning inmates from wearing their pants above their ankles to religious services appears in bright red text. As Islam is the only religion known for this belief, this demonstrates that this ban is not even remotely neutral.

<u>Count XII - Free Exercise</u>

71.    As the ban on wearing one's pants above their ankles was not rationally related to a neutral governmental interest, and it left Mr. Chesser with no other choice  but to violate one of his

13

sincerely held religious beliefs, and because lifting the ban did
not seriously effect government resources, Rivas, Roal, Kelly,
Neumann and Roloff violated his First Amendment right to Free
Exercise of Religion.

Exhaustion

72.    Mr. Chesser has exhausted his administrative remedies.
Exhibit B.

### C. - Imposition of Holiday Meals

73.    Mr. Chesser sincerely believes that his religion forbids
him from any form of participation in non-Islamic holidays and
festivals.

74.    The BOP provides all inmates with special meals on federal
holidays, Christmas and certain occassions such as the Super Bowl.
They do not offer any alternative to these meals.

75.    Mr. Chesser has been on a "certified religious diet (here-
inafter 'religious diet')" since around April, 2012, due to his
religious dietary requirements. The religious diet abides by the
teachings of Orthodox Judaism, but Jewish dietary laws are close
enough to Islamic ones that Mr. Chesser can eat most of the food
the religious diet offers. As Orthodox Judaism has far stricter
dietary laws than Islam, the religious diet imposes many restric-
tions on Mr. Chesser which have nothing to do with his religion.
However, the only diets which comply with Mr. Chesser's religious
beliefs are the religious diet and the BOP's vegetarian diet.

76.    On holidays, inmates on the religious diet in the CMU
receive a special meal for breakfast, lunch and dinner. The meals

14

provided on holidays are selected from some of the seemingly
better sounding meals which are served on other days to inmates
on the religious diet. For breakfast, inmates on the religious
diet receive a pack of coffee (which they would not normally
receive). For lunch and dinner, inmates receive more food than
they would normally get.

77.    Meals on the religious diet are ready-made. Thus, when
Mr. Chesser filed on this matter, defendant McCleary told him it
would be easy to provide him with a regular meal instead of the
holiday meal.

78.    Eating these holiday meals would violate Mr. Chesser's
sincerely held religious beliefs. Thus, on holidays, Mr. Chesser
is forced to either violate BOP rules by stockpiling non-holiday
food from the prison in his locker, or to go around 37 hours with
no food.

79.    Mr. Chesser has attempted to resolve this issue with
defendants McCleary and Walton. Walton simply delegated authority
to McCleary on this issue, and failed to take any action at all.
McCleary actually agreed to accomodate Mr. Chesser's beliefs at
first, so on the day of the Super Bowl, in 2013, Mr. Chesser was
provided the same meal he would normally have received absent the
occassion. However, McCleary only abided by this agreement on this
one occassion, and he stopped accomodating Mr. Chesser thereafter.

80.    The defendants have no interest whatsoever in refusing to
provide Mr. Chesser normal meals. It would actually save the BOP
money and time if they stopped sending him special food. McCleary
expressed this to Mr. Chesser specifically.

15

81.     Forcing Mr. Chesser to either participate in a Christmas meal or go hungry only serves to promote Christianity.

## Count XIII – RFRA

82.     Forcing Mr. Chesser to either eat holiday meals or go hungry substantially burdens his sincerely held religious beliefs. It neither furthers a compelling governmental interest, nor is it the least restrictive means of doing so. Therefore, Walton and McCleary are violating Mr. Chesser's rights under RFRA.

## Count XIV - Free Exercise

83.     This policy is not rationally related to a neutral governmental interest. It does not positively impact government resources. It offers Mr. Chesser no alternative to exercise his religious beliefs. Therefore, Walton and McCleary are violating Mr. Chesser's First Amendment right to Free Exercise of Religion.

## Count XV - Establishment

84.     For the same reasons, as well as the fact that Christmas is a religious holiday, the imposition of a Christmas meal by Walton and McCleary violates Mr. Chesser's rights under the Establishment Clause of the First Amendment.

## Exhaustion

85.     Mr. Chesser has exhausted his administrative remedies. Exhibit B.

### D. – Christmas Bags

86.     Defendants Winn and Walton oversee a program in which all inmates are provided a bag with special foods and products for free, shortly before Christmas each year.

87.     These bags are called "Christmas bags" by both inmates and staff, but this term seems to be unofficial, as they were called

"holiday bags" in the responses to Mr. Chesser's administrative remedies.

88.    Inmates are allowed to refuse to participate in this program at the time the Christmas bags are distributed.

89.    Islam has only two holidays. They are called 'Ids and occur on certain dates on the Islamic calendar. The Islamic calendar is lunar, so these dates move each year with respect to the Gregorian calendar. No 'Id will occur around Christmas for more than a decade.

90.    In 2011, Winn sent around a pamphlet which seemed to be using the "Islamic New Year" and the day of 'Ashurah as justifications for giving Muslims the holiday bags around the time of Christmas. However, "Islamic New Year" is not an Islamic holiday at all, and the day of 'Ashurah is a holy day on which asceticism is encouraged. A bag of "goodies" distributed for that day would likely be considered a heresy in Islam. All Muslims do on the day of 'Ashurah is that they fast in remembrance of when their Lord saved the prophet Musa (Moses) from the Egyptians.

91.    Such attempts to disguise the promotion of Christmas are shamefully hollow. Thus, when the bags are brought to Muslims, they are still called "Christmas bags" by staff.

92.    Even if the BOP's inclusion of other religions into the term "holiday bag" is sincere, this would simply mean that they are promoting religions with holidays around the time of Christmas, as opposed to those which do not.

93.    As the funds for these bags come from the profits of inmate purchases, Mr. Chesser has requested (unsuccessfully) to be completely severed from this program.

94.    Muslims represent around ten-percent of USP Marion's total population, so a very significant portion of the prison's most religious inmates are being left out of a program to help certain inmates celebrate their religious beliefs.

Count XVI - Establishment

95.    By supporting religions which have holidays around the time of Christmas to the exclusion of others, Walton and Winn are violating Mr. Chesser's rights under the Establishment Clause of the First Amendment. They must either provide a similar bag around the time of one of Islam's two holidays or stop providing the bags altogether.

Exhaustion

96.    Mr. Chesser has exhausted his administrative remedies. Exhibit B.

### E. - Denial of Liturgical Meal

97.    In 2012, on the Islamic holiday of 'Id ul-Adha, defendant McCleary sent the wrong number of fish-only trays to the CMU for the liturgical meal provided to Muslims. After he was informed of the problem, he refused to correct it. He later denied that this event even occurred, despite the presence of numerous witnesses, the fact that a number of inmates complained about it in writing and that an assistant warden came to the CMU to apologize for the mistake and to promise that the next year would be better.

98.    Robert Roloff came to the CMU and held a lengthy discussion with Mr. Chesser and others on the day of the incident. He was well-aware that a mistake had occurred, and he apologized for it. However, he later lied, and he claimed to have been present for the meal preparation and stated that there was no mistake when

18

Mr. Chesser filed his administrative appeal on the issue.

99.   Mr. Chesser sincerely believes that the consumption of non-ritually slaughtered land animals violates his religion's laws.

100.   Non-ritually slaughtered aquatic animals are allowed for consumption in Mr. Chesser's religion.

101.   Mr. Chesser was brought a tray with chicken and fish on it. Due to contamination from the oil of the chicken, there was no food on the tray which Mr. Chesser could eat.

102.   In drafting the request inmates in the CMU made for the contents of their liturgical meal, Mr. Chesser made it very clear that no contamination between chicken and fish should occur.

103.   In Islam, there is a difference of opinion over the issue of the permissibility of eating the regular meat of land animals in America. Mr. Chesser sincerely believes it is not permissible.

104.   The feast meal of 'Id ul-Adha is a central part of Mr. Chesser's sincerely held religious beliefs. Refusing to provide him this meal, severely harmed his religious exercise.

105.   While Mr. Chesser could have eaten the regular meal at lunch, he skipped it, in order to be able to participate in the anticipated liturgical meal.

106.   It would have been particularly easy to rectify this problem, as USP Marion actually prepared fish for the entire inmate population as a part of their regularly scheduled meal on that day.

107.   McCleary could also have sent a religious diet meal if he no longer had resources to provide a fish meal, as these meals are ready-made.

Count XVII - Free Exercise

108.    The refusal to provide Mr. Chesser a liturgical meal
which he could eat was not rationally related to a neutral govern-
mental interest. Fixing the problem would not have seriously
impacted government resources. It completely denied Mr. Chesser
the ability to engage in a practice central to his sincerely held
religious beliefs. Therefore, McCleary and Roloff (through his
supportive role) violated Mr. Chesser's right to Free Exercise
under the First Amendment.

Count XVIII - Equal Protection

109.    By excluding Muslims who have stricter dietary practices
normally accomodated by the BOP from meaningful participation in
the liturgical meal, but providing a meaningful liturgical meal
to all other inmates (Muslim and non-Muslim), without good cause,
McCleary and Roloff violated Mr. Chesser's right to Equal Protec-
tion as implied by the Fifth Amendment.

Exhaustion

110.    Mr. Chesser has exhausted his administrative remedies.
Exhibit B.

### F. - Contract Imam

111.    Bashar Murad is the only Islamic contractor available at
USP Marion.

112.    Upon information and belief, Bashar Murad is from an
obscure Sufi sect which believes things considered by orthodox
Sunni Muslims to be heretical and blasphemous, such as the belief
that Bashar Al-Assad should be supported in Syria and a belief in
the concept of Feng Shui. This information has been gathered from

20

numerous inmates who have interacted with Murad.

113.     In orthodox mainstream Islam, the belief that Al-Assad should be supported is considered to take someone outside of the fold of Islam.

114.     Murad has also filed an affidavit in a separate suit in which he referred to the followers of the Nation of Islam and the Moorish Science Temple as Muslims. He did this to help the BOP enforce a ban on group prayer (the ban was later ruled to violate RFRA). Both of these acts are considered potential nullifiers of one's Islam by orthodox Muslims.

115.     There is a distinction in Islam between saying an act can nullify one's Islam and saying a particular person has in fact exited the religion, because of this act. Thus, Mr. Chesser does not currently consider Murad to be a non-Muslim.

116.     However, Mr. Chesser and virtually every Muslim in the CMU consider Murad to be an extreme heretic who cannot be sought for religious advice or utilized for any religious purpose. Thus, Murad simply comes to the CMU once a month to stand near the officers' station for a few minutes, and this is the only function he serves as none of the Muslims speak to him.

117.     Having access to a trained religious professional with similar beliefs is an integral part of Mr. Chesser's sincerely held religious beliefs.

118.     Mr. Chesser and the other Muslim inmates would be fine with any qualified individual with mainstream Islamic beliefs, even if they do not follow the exact same approach as they do.

119.     Upon information and belief, Walton and Roloff are in

21

charge of hiring a contract Imam, due to their official roles at USP Marion.

120.    Switching contractors is a routine practice, and it would not unduly burden the government's resources.

Count XIX - RFRA

121.    Failure to provide Mr. Chesser and the Muslims in the CMU with a contract Imam with relatively similar beliefs substantially burdens his religious exercise. It does not further a compelling governmental interest, nor is it the least restrictive means of doing so. Therefore, Walton and Roloff are violating Mr. Chesser's rights under RFRA.

Exhaustion

122.    Mr. Chesser has exhausted his administrative remedies. Exhibit B.

G. - Personal Fasts

123.    Mr. Chesser sincerely believes that his religion highly recommends fasting from food and drink from sunrise to sunset on days other than those in the holy month known as Ramadan.

124.    Jeffrey Walton has declined to provide Mr. Chesser with any way of breaking his fasts outside of Ramadan using food provided by the prison, except if Mr. Chesser smuggles it out of the chow hall in violation of prison rules. This is not always successful, and it puts Mr. Chesser at risk of severe discipline.

125.    Were the plaintiff to purchase his own food to break his fasts with, he would barely be able to afford any communication with his family and he could not afford to litigate anything in Court. In fact, this is not even a real option for Mr. Chesser,

22

because the only reason he receives enough money to purchase food in the quantities which would be required for breaking his fast, is so that he can communicate with his family. If he were to stop communicating with his family, he would stop receiving money. The current policy substantially burdens Mr. Chesser's religious exercise by forcing him to choose between fulfilling his religious practice  of fasting and his family, his right to address his grievances in Court and potentially receiving severe discipline possibly resulting in a lengthening of his prison sentence.

126.     From different perspectives, Walton's policy furthers the governmental interests of reducing the number of tasks staff in the kitchen must perform, the frequency with which guards must leave their office to watch Mr. Chesser eat to prevent him from smuggling his food, and the promotion of food safety by preventing inmates from storing perishable foods.

127.     However, there are many policies in the CMU which prove that these are not **compelling** governmental interests.

128.     Each Ramadan the prison accomodates 30 days of fasting for around 100 inmates by providing sack meals before sunrise and two cooked meals at sunset. The former are served to inmates in their cells, while the latter are served together at sunset, under the supervision of a guard. Prison staff make no efforts to keep inmates from storing the food they provide in the morning in their cells. As milk and eggs are frequent items in these sack meals, the risk of the food perishing is as high as it can get.

129.     The prison also allows inmates in the CMU who are on the religious diet to take pre-cooked perishable meals back to their

23

cells for unsupervised consumption at their leisure on certain holidays.

130.    Also, when the elevator used to transport food to the CMU breaks down, all inmates in the CMU take their regularly scheduled meals wherever they please for unsupervised consumption at their leisure.

131.    Further, even if these interests were compelling, there are many less restrictive means of achieving them. For example[1], the plaintiff could be allowed to store his food in the refrigerator in the guards' office and to consume it in front of the office door at sunset. This solves both problems of sanitation and resources, as the kitchen would not have to cook a new meal and the guards would not have to leave their office.

Count XX - RFRA

132.    Jeffrey Walton's policy of not providing Mr. Chesser any means of consuming prison-provided meals whilst engaging in personal fasts substantially burdens the exercise of one of Mr. Chesser's sincerely held religious beliefs. It neither furthers a compelling governmental interest, nor is it the least restrictive means of doing so. Therefore, Walton is violating Mr. Chesser's rights under RFRA.

Exhaustion

133.    Mr. Chesser has exhausted his administrative remedies. Exhibit B.

H. - Retaliation Over Senate Report

134.    Since arriving at the CMU in May, 2011, Mr. Chesser has been placed in administrative segregation three times. All of these

_____

[1] Mr. Chesser is not obligated to give examples.

24

instances involved retaliation for his exercise of his First
Amendment rights.

135.    On the first occassion, Mr. Chesser was placed in segre-
gation by Rivas, Roal and Neumann from around November 30, 2011 to
January 9, 2012. The grounds given on paper were that the prison
needed to conduct a threat assessment to evaluate Mr. Chesser's
safety in the CMU.

136.    Over this period, Rivas, Roal and Neumann all refused to
provide Mr. Chesser with a specific cause for his safety being
threatened.

137.    These three defendants treated Mr. Chesser with particular
belligerence while he was being held in segregation on this occa-
sion. Such behavior was completely inconcsistent with their stated
purpose for keeping Mr. Chesser in segregation, so he concluded
that they were likely retaliating against him for something, but
he did not know exactly why.

138.    Mr. Chesser concluded that part of the purpose behind
holding him in segregation was to sabotage his ability to fight
his mother in a child custody case. This might sound like an odd
matter for prison officials to get involved in, but there is a
great deal of evidence to substantiate this.

139.    Mr. Chesser's mother, Barbara Chesser, is a prosecutor
with the government of the District of Columbia, and the FBI has
been actively engaged in helping her gain custody of Mr. Chesser's
son. This activity has included the disclosure of the contents of
some of Mr. Chesser's communications with his wife to his mother,
the intercepting of his (then) one-year-old son in the airport to
prevent him from leaving the country and the fabrication of events

which would help Barbara Chesser in her petition for custody of Mr. Chesser's son. Some of the disclosed communications came from the CMU. Allegedly, the FBI was doing this to prevent Mr. Chesser from violating one of the terms of his plea agreement, although many of their actions completely contradict their stated reasons. See Exhibit D for an FBI Memorandum explaining some of these issues.

140.    In addition to this, Rivas, Roal and Neumann had been tampering with and even rejecting some of Mr. Chesser's legal mail which was associated with this case, as will be described later.

141.    By placing Mr. Chesser in segregation, they cut Mr. Chesser off from communicating with his wife, who lives in Jordan. As he was placed in segregation for the last few weeks before the January 5, 2012 trial in this case, Mr. Chesser and his wife were severely harmed by their inability to work together on this case, and they ultimately lost their son, although litigation is still ongoing.

142.    Mr. Chesser concluded that at least one of the reasons he was in isolation was to hurt his chances in this case. Thus, on January 4, 2012, the day before the trial, Mr. Chesser sent his guardian ad litem, David Silek, a letter explaining that while he had not been told the nature of the "threat" to his life, he was certain it would end as soon as the trial was over. Sure enough, on January 5, 2012, Henry Rivas informed Mr. Chesser that the so-called "threat" was over, and he would be released from segregation. Roal was not available to sign off on the order until the following Monday, so Mr. Chesser was released on or around

26

January 9, 2012.

143.    Based on what follows, harming Mr. Chesser's ability
to litigate his son's child custody case was not the main reason
for placing him in segregation, but was merely an additional means
of punishing him.

144.    Further indicating that the purpose of holding Mr. Chesser
was retaliation and not his safety is that no "threat assessment
investigation" was conducted prior to his release.

145.    Toward the end of February, 2012, Rivas, Roal and Neumann
placed Mr. Chesser in segregation again. However, this time they
informed him that it was due to some things which were written by
the top counterterrorism advisor to the Senate Committee on Home-
land Security and Governmental Affairs, Seamus Hughes, in a Senate
Report he submitted on Mr. Chesser. The defendants claimed that
this report would threaten Mr. Chesser's safety if inmates learned
about it, although they later contradicted this statement.

146.    On this occassion, Henry Rivas informed Mr. Chesser that
he had been placed in segregation on the previous occassion for
the same reason, but that they "simply did not have enough evidence
to keep holding him," so they released him.

147.    Rivas claimed that Mr. Chesser could only come out of
segregation if he told the whole unit about certain things in the
report and then certain individuals claimed that they would not
harm Mr. Chesser as a result. Obviously, this contradicts the idea
that informing these inmates of the Senate Report jeopardized Mr.
Chesser's safety. However, as Mr. Chesser later learned that safety
had nothing to do with why he was placed in segregation, this is
not surprising. After conveying this information to the unit, Mr.

27

Chesser was released. He spent around three weeks in segregation.

148.    Neumann refused to let Mr. Chesser see the Senate Report, and he said that even if it came through "legal mail," he would reject it.

149.    In May, 2012, Mr. Chesser was again placed in segregation over an incident which will be described later.

150.    After a few days, on May 8, 2012, between 12:00 p.m. and 3:00 p.m., Milton Neumann informed Mr. Chesser that he had been placed in segregation twice before "for writing things." Then he said, "Maybe you should learn your lesson." On May 7, 2012, at around the same time, he said something similar, but he attributed this comment to Wendy Roal.

151.    Upon information and belief, the writings Neumann was referrencing were letters Mr. Chesser sent Seamus Hughes, which were published in his Senate Report shortly after Mr. Chesser was placed in segregation the second time.

152.    This is based on the fact that Mr. Chesser had previously been informed that the Senate Report was the source of his being placed in segregation, and these were his only writings affiliated with that report.

153.    Jeffrey Walton later confirmed that it was Mr. Chesser's writings, not the writings of Seamus Hughes, which caused him to be placed in segregation. In response to Mr. Chesser's formal grievance on this issue, Walton replied, "A review of records reveals you were placed in SHU [(segregated housing unit)] for your protection pending  a threat assessment concerning documents _you_ had written." (emphasis added). Exhibit E. This contradicts the reason Rivas provided Mr. Chesser, that Hughes's writings were the real cause.

28

154.     Mr. Chesser's writings to Seamus Hughes were highly critical of Rivas, Roal, Neumann and the entire BOP. He leveled accusations of bigotry and discrimination against them. He claimed that their policies toward Muslims in the CMU actually promoted terrorism rather than preventing it. When the letters were published, they garnered internatioal media attention, due to their being attached to the Senate Report.

155.     The clear admissions by the BOP that Mr. Chesser's writings caused him to be placed in isolation and Neumann's comment that Mr. Chesser ought to learn his lesson for writing things are proof that Rivas, Roal and Neumann were retaliating against Mr. Chesser for criticizing them before the United States Senate.

156.     Upon information and belief, Rivas, Roal and Neumann learned about this information by opening and reading his letters to Seamus Hughes, as the report was only published after he was placed in segregation. These letters were sealed and properly marked as "special mail." This practice had a chilling effect on Mr. Chesser's right to communicate with the United States Senate and others through private "special mail."

Counts XXI and XXII - Free Speech Retaliation

157.     Mr. Chesser's right to criticize government officials, especially to another government body such as the Senate, is clearly protected by the First Amendment guarantee of Freedom of Speech. There is no possible governmental interest to the contrary which is not related to the suppression of expresion. By placing Mr. Chesser in segregation on two occasions to punish him for exercising this right, Rivas, Roal and Neumann twice violated

Mr. Chesser's First Amendment right to Free Speech through their retaliation against him.

<u>Count XXIII - Free Speech (Special Mail)</u>

158.    Opening and reading Mr. Chesser's special mail to the Senate does not further an important or substantial governmental interest unrelated to the suppression of expression. It is also not the least restrictive means of protecting such an interest. Thus, by engaging in this activity, Rivas, Roal and Neumann violated Mr. Chesser's First Amendment right to Freedom of Speech.

<u>Exhaustion</u>

159.    Mr. Chesser has exhausted his administrative remedies. Exhibit E.

I. - Religious Question Retaliation

160.    On or around May 1, 2012, Mr. Chesser was placed in segregation by Rivas, Roal, Cardona and Neumann for an investigation.

161.    BOP policy requires that the type of investigation be specified on a paper handed to the inmate shortly after his placement in segregation, but Mr. Chesser was never provided a paper which fully complied with this policy. Rather, he was only informed that his "activities" were being investigated.

162.    Cardona and Neumann were very hostile toward Mr. Chesser on this occassion. When Mr. Chesser asked why he was placed in segregation, they simply responded, "You know why you are in the SHU." However, Mr. Chesser did not know why he was being placed in segregation.

163.    Later, some inmates who had spoken to Cardona and Neumann informed Mr. Chesser that he was being held in segregation over an

30

e-mail he wrote. However, Mr. Chesser had not sent any e-mail he could imagine causing him to be placed in segregation, not even out of retaliation.

164.    On or around May 7, 2012, Neumann and Cardona informed Mr. Chesser that he was being held in segregation over a draft e-mail which he had not yet sent. This e-mail contained two religious questions Mr. Chesser was trying to have an Islamic scholar answer. The defendants later informed him that the question which bothered them was Mr. Chesser's second question which regarded community organization. Neumann said that this question had upset Wendy Roal.

165.    Infuriated that they had placed him in segregation over an e-mail which was asking for religious advice, Mr. Chesser exploded on Neumann and Cardona and told them that he would sue them and go to the media. After this, Cardona changed some of his hostile behavior, but Neumann remained extremely hostile.

166.    On May 8, 2012, as mentioned before, Neumann told Mr. Chesser, "You were in here last time for writing things, weren't you? Maybe you should learn your lesson."

167.    On May 10, 2012, between 12:00 p.m. and 3:00 p.m., Mr. Chesser asked Neumann whether or not he would be let out of segregation once the ninety days allotted for an investigation had expired. Neumann gave a derisive laugh, then told Mr. Chesser that he could always extend the time if he wanted.

168.    All of Neumann's statements prove a retaliatory intent was behind Mr. Chesser's placement in segregation on this occassion as well as the two previous occassions mentioned before.

169.    At some point on or after May 7, 2012, Cardona tried to

31

justify his actions by alleging Mr. Chesser was inciting violence
in his draft e-mail.

170.    Mr. Chesser quickly responded by sending Wendy Roal a
"cop-out" saying that nobody except an extreme bigot who assumed
Islam was only about violence and killing would interpret Mr.
Chesser's draft as inciting violence, and he conveyed to her his
threat to sue and go to the media. He also explained to her that
it was preposterous to place him in segregation over a draft
e-mail which he had not even finished writing yet.

171.    After receiving this letter, Roal told Mr. Chesser that
she would work on getting Mr. Chesser out of segregation.

172.    Just prior to his release, Mr. Chesser was asked by
Cardona what prison staff should do if the scholar responding to
Mr. Chesser's question said that it was necessary to use violence
to organize the Muslim community in the CMU. Mr. Chesser told him
that no Muslim scholar would ever say that, but that even if one
did, the the BOP's CTU staff which read all of his incoming e-mails
could simply reject that scholar's response.

173.    As mentioned before, consulting religious scholars is an
obligation in Mr. Chesser's religion. Denying him the ability to
consult them on any issue substantially burdens his religious
exercise.

174.    Mr. Chesser was still not allowed to send this e-mail
after his release from segregation, which occurred around three
weeks after he was initially placed in segregation.

Counts XXIV and XXV - First Amendment Retaliation

175.    Mr. Chesser's e-mail was protected by the First Amendment
Free Speech and Free Exercise Clauses. There was no important

32

or substantial governmental interest unrelated to the suppression of expression furthered by censoring this e-mail. Rivas, Roal, Cardona and Neumann retaliated against Mr. Chesser by placing him in segregation over this e-mail, thereby violating his rights to Free Speech and Free Exercise.

Counts XXVI and XXVII - Free Speech and Free Exercise

176.    Censoring Mr. Chesser's draft e-mail irreparably damaged his rights to Free Exercise and Free Speech. It was not in furtherance of an important or substantial governmental interest unrelated to the suppression of expression, nor was it the least restrictive means of furthering such an interest [2]. Therefore, Rivas, Roal, Cardona and Neumann violated Mr. Chesser's rights to Free Exercise and Free Speech under the First Amendment by censoring his e-mail.

Exhaustion

177.    Mr. Chesser has exhausted his administrative remedies. Exhibit E.

### J. - SHU E-Mail Retaliation

178.    While in segregation on this third occassion, Mr. Chesser decided to document a 24-hour period of his experience. He wrote in a creative literary fashion and documented such things as a guard prohibiting him from making the Islamic call to prayer, his struggle to pray in congregation with other Muslims in segregation without being detected, and other more mundane matters. The piece, while doing little more than narrating events, cast a very negative light on practices in the CMU.

---

[2] This is the test established by the Supreme Court for outgoing mail. However, Mr. Chesser would contend that censoring an inmate's drafts should either be held to a strict scrutiny standard, or that it may even unilaterally violate the First Amendment, as this is tantamount to policing one's thoughts.

179.     Upon release from segregation, Mr. Chesser began trans-
cribing his narrative to his e-mail account as a draft, in hopes
of publishing it online through a third-party.

180.     On June 5, 2012, at around one o'clock p.m., Steven
Cardona and Milton Neumann called Mr. Chesser into their office.
Neumann said to him, "You just won't learn your lesson will you?
You just got out of the SHU for your writings didn't you?" He and
Cardona explained to Mr. Chesser that his e-mail was upsetting
them. Cardona said, "You think trying to neither confirm nor deny
what you wrote is real smart, huh?" Mr. Chesser had written at the
top of his e-mail, "I am neither confirming nor denying the accur-
acy of this posting due to issues of retaliation." Cardona contin-
ued, "I will [explitive] put your [explitive] in the SHU and
investigate you for forever, you little punk. Everytime six months
[the time allotted for a single investigation with an extension]
is up, I will just make up a new one. If you send that e-mail, you
will never leave the SHU."

181.     Under obvious durress, Mr. Chesser agreed to delete the
e-mail. However, before deleting it, he printed a copy of it for
evidence. Exhibit F.

Count XXVIII - First Amendment Retaliation

182.     Mr. Chesser's e-mail was protected by the First Amendment
Freedom of Speech Clause. Censoring it did not further an impor-
tant or substantial governmental interest not related to the
suppression of expression. By threatening to permanently place
Mr. Chesser in segregation over this e-mail, Cardona and Neumann
retaliated against Mr. Chesser, thus violating his right to
Freedom of Speech under the First Amendment.

34

<u>Count XXIX - Free Speech</u>

183.   · Based on this, and the fact that it was not the least
restrictive means of protecting an important or substantial
governmental interest unrelated to the suppression of expression,
Cardona and Neumann violated Mr. Chesser's right to Freedom of
Speech under the First Amendment by forcing him to delete his draft
of this e-mail.

<u>Exhaustion</u>

184.   Mr. Chesser has exhausted his administrative remedies.
Exhibit E.

## K. - Delaying Communications

185.   Mr. Chesser's incoming and outgoing communicatiosn often
suffer extreme delays.

186.   For example, the first part of a two-part e-mail, which
Mr. Chesser's wife had sent him, on child rearing in Islam suffered
a three=month delay. Strangely, the second part of the e-mail was
approved right away.

187.   Also, around July 13, 2011, the day Mr. Chesser's mother
filed a petition for custody of his son, based on a tip the FBI
supposedly gave her based on e-mails he sent his wife fromthe CMU,
Mr. Chesser suddenly stopped receiving any e-mails for approximate-
ly two weeks, despite the fact that his wife was frantically
sending him e-mails about his mother's petition on a daily basis.

188.   Sometimes, when Mr. Chesser is responding to an event in
the news, his e-mails will be delayed for a few weeks until the
story is no longer in the public's interest. For example, in
September, 2012, Mr. Chesser wrote a peaceful and benign article
in response to a movie which had been published mocking and slan-

dering his religion. It was not approved until the story was no longer receiving significant coverage. Due to Mr. Chesser's case, his article had the potential to influence events and public opinion, but it was effectively squashed by this delay.

189.    Also, in or around August, 2011, Mr. Chesser was contacted by a journalist with TV Asahi, a Japanese television station. After the journalist was denied the opportunity to interview Mr. Chesser in person, and after Henry Rivas refused to allow Mr. Chesser to send special mail to the journalist on the clearly false grounds that TV Asahi was not a media organization, the journalist elected to interview Mr. Chesser through e-mails. Mr. Chesser's responses to his questions were delayed until after the journalist's story aired.

190.    Mr. Chesser has no way of learning if his incoming or outgoing communications have been delayed or why. This often creates confusion when either he or the other party assumes that their communications have been received.

191.    Based on their job descriptions, Henry Rivas, Leslie Smith, April Cruitt, T. Capaldo, Stephen Colt and J. Simmons are all involved in approving Mr. Chesser's communications.

Count XXX - Free Speech

192.    The practice of Rivas, Smith, Capaldo, Cruitt, Colt and Simmons of delaying Mr. Chesser's e-mails with no notification and without good cause violates Mr. Chesser's First Amendment right to Free Speech, as it is not in furtherance of an important or substantial governmental interest  unrelated to the suppression of expression, nor the least restrictive means of protecting such an interest; and because it is not rationally related to a neutral

36

governmental interest.

Exhaustion

193.    Mr. Chesser has exhausted his administrative remedies.
Exhibit G.

### L. - Denial of Discovery

194.    Since his arrest in July, 2010, Mr. Chesser has been
trying to gain access to his discovery, most of which is electronic
and publicly available on the internet. Immediately after arriving
at the CMU in May, 2010, Mr. Chesser began requesting his
attorneys send him his discovery on a hardrive, in order to
file a habeas corpus petition.

195.    Mr. Chesser is convinced that he can prove he did not
commit certain crimes mentioned in his plea agreement with this
discovery. He believes this discovery will enable him to prove
that he received ineffective assistance of counsel, thus enabling
him to overturn his plea agreement. Mr. Chesser believes that this
is the only way to establish these things in his case.

196.    Mr. Chesser also needed this discovery to prove his plea
agreement contained a great deal of false information in the
aforementioned custody case, as his deal was used against him in
that proceeding. Part of the reason Mr. Chesser and his wife lost
their son was due to not having his discovery.

197.    In or around July, 2011, Mr. Chesser's attorneys gained
approval from Milton Neumann to send in a hardrive with his
discovery on it. However, when they sent Mr. Chesser his discovery,
Wendy Roal rejected it on grounds that Neumann acted outside of
his authority by approving it.

198.    After securing Roal's personal approval, Mr. Chesser's

attorneys again delivered the hardrive to the prison. However, Roal rejected it again. This time, she rejected it on grounds that Mr. Chesser's discovery was more appropriate to place on compact discs ("CDs").

199.    In or around June, 2012, Mr. Chesser's attorneys sent his discovery on fifteen CDs. However, on July 2, 2012, Mr. Chesser was informed that Roal was again rejecting Mr. Chesser's evidence. This time it was on grounds that his evidence allegedly threatened security. Apparently, Roal, Neumann and others had reviewed Mr. Chesser's legal materials in order to come to this conclusion.

200.    When Mr. Chesser asked Neumann exactly which parts of his discovery threatened security, Neumann told him, "All of it."

201.    Mr. Chesser's discovery contains thousands, if not millions, of files. He believes that most of them are utterly harmless, due to his knowledge of his own actions prior to his arrest. Based on his plea agreement, the electronic discovery is likely to contain books and lectures which are currently available from the prison library at USP Marion. Also, Mr. Chesser has seen that some of the discovery is simply screenshots from a defunct Facebook profile he had in high school. These files could not possibly threaten security.

202.    While Mr. Chesser does not have any way of knowing what parts of his discoery supposedly threatened security, and he is assuming Neumann did not seriously mean it all threatened security, these concerns are alleviated by the CMU's already existing policies. Inmates in the CMU are only able to view electronic discovery while they are locked in a cell with nobody else inside. Thus, Mr. Chesser could not promulgate the files in his discovery.

203.    To his knowledge, virtually all of Mr. Chesser's evidence which is not obviously entirely benign, is simply what one might call "propaganda." Thus, the only possible threat the prison could argue exists is an ideological one. This is defeated by the policy preventing other inmates from seeing his discovery.

Count XXXI - Access to the Courts

204.    By denying Mr. Chesser his discovery, Neumann and Roal have prevented Mr. Chesser from even being able to evaluate the merits of filing a habeas corpus petition, not to mention his ability to file one. This action was not rationally related to a neutral governmental interest, it leaves Mr. Chesser no other way of accessing the Courts to file a habeas corpus petition, and the action did not relieve any government resources at all. Thus, Roal and Neumann violated Mr. Chesser's First Amendment right to access the courts.

Count XXXII - Free Speech

205.    As the denial was not rationally related to a neutral governmental interest, Roal and Neumann violated Mr. Chesser's First Amendment right to Free Speech by censoring his entire collection of discovery.

Exhaustion

206.    Mr. Chesser has exhausted his administrative remedies. Exhibit H.

## M. - Legal Mail Conspiracy

207.    In or around May, 2011, Mr. Chesser received a letter from his guardian ad litem, David Silek, which was marked "Attorney-Client Communication." This was part of the aforementioned child custody case. However, as the envelope was missing certain criteria

demanded by Henry Rivas for legal mail to be opened in an inmate's presence, he opened it out of Mr. Chesser's presence and submitted it for reading and analysis.

208.    When Mr. Chesser asked why he did this, Rivas cited a single technicality which he claimed caused him to be allowed to open the envelope out of Mr. Chesser's presence. He told Mr. Chesser that if David Silek fixed this issue, then he would not open future letters.

209.    Mr. Chesser explained this matter to David Silek in or around August, 2011. It took Mr. Chesser so long to respond, due to the fact that CTU staff refused to approve David Silek as one of Mr. Chesser's contacts until around a month of time had elapsed since he submitted him for approval. This delay also aided Mr. Chesser's mother, because she was able to file her petition for custody at a point when Mr. Chesser could not respond. As Mr. Chesser's mother was helped by the FBI and CTU staff in her petition, this is suggestive of alterior motives for this profound delay. Such an act casts a darker shadow over the acts to be described in what follows.

210.    In his next letter, David Silek corrected the error Rivas cited, but Rivas again opened it out of Mr. Chesser's presence. This time he cited another small technical issue.     He assured Mr. Chesser that if he corrected it, then he would not open Mr. Chesser's mail.

211.    Mr. Chesser had David Silek correct this issue, but Rivas again opened the letter outside of Mr. Chesser's presence and cited another technicality. This process occurred three to five times.

212.    Upon information and belief, on at least one occassion,

Milton Neumann provided David Silek false instructions on how to fill out legal mail so that it would not be opened outside of Mr. Chesser's presence. However, when David Silek sent Mr. Chesser some exhibits from Barbara Chesser's Request for Admissions, the envelope, which was filled out according to Neumann's directions, was opened outside of Mr. Chesser's presence by Henry Rivas. The contents were then read and rejected by Wendy Roal. This occured in or around October, 2011. Exhibit I.

213.   Upon information and belief, Neumann also lied to Maryse Allen, the attorney for Barbara Chesser, when she asked why the exhibits from her client had been rejected. Neumann also gave her the same false instructions he gave to David Silek. See Exhibit I, which contains the contents of a few letters between Maryse Allen and David Silek as well as copies of the envelopes at controversy.

214.   After this incident, Mr. Chesser researched the issue of legal mail in the Code of Federal Regulations and sent David Silek instructions based on his own research. Exhibit I. David Silek's communications were not opened out of Mr. Chesser's presence after that, unless it occurred discreetly.

215.   Properly marked legal mail which was sent to Mr. Chesser by a new guardian ad litem was also opened outside of his presence by Henry Rivas, in or around December, 2012. Also, a letter from a Court in Virginia which was properly marked was subjected to the same process, in or around March, 2013.

216.   These misleading tactics which were employed by Rivas, Roal and Neumann had a chilling effect on Mr. Chesser's right to attorney-client priveldged communications, which was further exacerbated by the fact that the FBI was disclosing his correspondences to his mother.

Count XXXIII - Legal Mail

217.    Opening and reading Mr. Chesser's legal mail after conspiring to mislead him, his guardian ad litem and even an opposing attorney was not rationally related to a neutral governmental interest. It did not positively impact government resources. It did not leave Mr. Chesser alternative ways of exercising his rights. Therefore, by engaging in this activity, Rivas, Roal and Neumann violated his right under the First Amendment to have his legal mail opened only in his presence.

Exhaustion

218.    Mr. Chesser has exhausted his administrative remedies. Exhibit E.

## Conclusion

219.    None of the actions of the defendants were substantially justified.

220.    All of these actions have caused or are causing Mr. Chesser irreparable harm for which there is no adequate remedy at law.

### V - Mr. Chesser's Other Complaints

221.    Mr. Chesser has a complaint which was filed in or around December, 2012 in the Southern District of Illinois. It is called Chesser v. J.S. Walton, et al. It deals with prison conditions. Its number is 3:12-CV-01198-JPG. It is before Judge J. Phil Gilbert. It is pending screening.

222.    Mr. Chesser has another suit which he filed in the Eastern District of Virginia. It is called Chesser, et al. v. Chesser, et al., No. 1:13-CV-129 LO/IDD. It did not deal with prison conditions substantially. It is before Judge Liam O'Grady. It was dismissed as factually frivolous, but Mr. Chesser has filed

42

a Motion for Reconsideration and an appeal, both of which are still pending. This complaint was filed in January, 2013.

## VI - Request for Relief

WHEREFORE, Mr. Chesser requests this Court:

a.      Accept jurisdiction of this case and set it for hearing.

b.      Declare that the defendants are violating or have violated Federal and Constitutional law as noted above.

c.      Enjoin the defendants from restricting foreign language learning, imposing holiday meals on Mr. Chesser, only providing special bags around Christmas time as opposed to the holidays of Muslims too, not hiring a contract Imam with similar beliefs to Mr. Chesser and the other Muslims in the CMU, denying Mr. Chesser a means of partaking in a personal fast with prison-provided food, censoring the two draft communications they have censored, delaying his communications without good cause or notification, preventing him from viewing his legal discovery and opening his legal and special mail outside of his presence.

d.      Award Mr. Chesser $20,000 in compensatory damages generally and $20,000 in punitive damages specifically against each defendant for counts 2, 4, 6, 8, 10, 12, 14, 15, 23, 26, 27, 29, 31, and 32; award him $20,000 in compensatory damages generally and $40,000 in punitive damages specifically against each defendant for count 28; award him $10,000 in compensatory damages generally and $10,000 in punitive damages specifically against

43

each defendant for counts 3, 5, 7, 9, 11, 16, 17, 18, and 30; award him $100,000 in compensatory damages generally and $100,000 in punitive damages specifically against each defendant for count 21; award him $50,000 in compensatory damages generally and $100,000 in punitive damages against each defendant for counts 22 and 33; award him $25,000 in compensatory damages generally and $60,000 in punitive damages specifically against each defendant for counts 24 and 25.

e.      Award Mr. Chesser his costs and reasonable attorney fees.

f.      Award all other proper relief.

### VII - Verification

I, Zachary Chesser, state the above facts to be true to the best of my knowledge and memory, under the penalty of perjury.

RESPECTULLY SUBMITTED,

Zachary Chesser, Pro se
76715-083
USP Marion
P.O. Box 1000
Marion, IL 62959
Dated: 05/06/2013
[3]

---

[3] This complaint was substantially aided by Darnell "Qamar el-Din 'Abdul-Lateef" Moon.