IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINIOS

ZACHARY CHESSER,         )
                                   )
      Plaintiff,         )
                                   )
        v.          )         Case No. 13-cv-456-JPG-RJD
                                   )
HENRY RIVAS, *et al.*,     )
                                   )
      Defendants.     )

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

The Court held a bench trial in this civil lawsuit brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), in Benton, Illinois, on August 14-16, 2017. Plaintiff Zachary Chesser appeared *pro se* via video-conference from the Administrative Maximum Penitentiary at Florence, Colorado ("ADX-Florence"). The defendants are Henry Rivas, Robert Roloff, Milton Neumann, Steven Cardona, Wendy Roal, and Jeffrey Walton, all of whom are current or former Federal Bureau of Prisons ("BOP") employees. The defendants were represented by Assistant United States Attorneys Nathan E. Wyatt and Nicholas J. Biersbach. Chesser called as witnesses himself and four other federal inmates – Ghassan Elashi, Stephen M. Moorer, Mohammad Zaki Amawi, and Wali Khan Amin Shah – all of whom appeared via videoconference from their respective institutions. All defendants testified during the defendants' case.[1]

---

[1] Before the trial began, the Court ensured that the videoconferencing of this trial complied with the standards set forth in *Perotti v. Quinones*, 790 F.3d 712, 721 (7th Cir. 2015) (citing *Stone v. Morris,* 546 F.2d 730, 735-36 (7th Cir. 1976)), as adapted for a bench trial. This included testing the three-way video function with officials at ADX-Florence and a third location to ensure Chesser would be able to see, at the same time on a split screen, the Court and each inmate

## I.    Background

Chesser filed this action in May 2013 complaining of various aspects of his confinement in the Communication Management Unit ("CMU") at the United States Penitentiary at Marion, Illinois ("USP-Marion") from May 2, 2011, to June 2, 2014 (Doc. 1).  The Court construed the Complaint to contain twenty-one causes of action; nineteen survived threshold review under 28 U.S.C. § 1915A (Doc. 8).  Through his own amendments and voluntarily dismissals, Chesser narrowed his case to eight counts.  Only two counts survived summary judgment (Doc. 223).[2]

In those two counts, both *Bivens* actions against individual defendants, Chesser complains that rules restricting the teaching/learning Arabic (Count 5 against Rivas, Roloff, Neumann, Cardona, Roal, and Walton) and prohibiting him from wearing short pants (Count 23 against Rivas, Roloff, Neumann, Roal, and Walton) violated the equal protection guarantee in the due process clause of the Fifth Amendment.  With respect to Count 5, Chesser believes he was singled out based on his religion for disparate treatment by the defendants because he was prohibited from gathering with other Muslim inmates to learn Arabic while other non-Muslim inmates were allowed to gather to study foreign languages.  With respect to Count 23, Chesser claims the defendants only prohibited Muslim inmates from wearing short pants, whereas non-Muslim inmates were permitted to do so.  At trial, the Court, with Chesser's agreement, granted judgment pursuant to Federal Rule of Civil Procedure 52(c) in favor of Walton on Count 23.  Tr. at 252.

---

witness while he was testifying.  At trial, during an inmate witness's testimony, the Court saw Chesser/witness, Chesser saw the Court/witness, and the witness saw the Court/Chesser.

[2] The issue in this case is *not* whether the defendants deprived Chesser of his First Amendment right to freely exercise his religion.  To the extent Chesser made any such claims, the Court resolved them at the summary judgment stage by concluding that the defendants were entitled to qualified immunity (Doc. 223).

It is undisputed that the defendants were acting under color of law and within the scope of their official duties at all relevant times. Each of the defendants was employed at USP-Marion for at least a portion of the relevant time-period. The defendants deny Chesser's allegations.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following relevant findings of fact and conclusions of law.

## II.     Findings of Fact

The Court finds the following relevant facts by a preponderance of the evidence:[3]

### A.     The Parties

1. Plaintiff Zachary Chesser is a Muslim. He is currently serving a 300-month sentence imposed by the United States District Court for the Eastern District of Virginia. In his criminal case, Chesser pled guilty to three felony counts, namely: (1) Communicating Threats, (2) Soliciting Others to Threaten Violence, and (3) Providing Material Support to Terrorists.

2. Chesser was housed in the CMU at USP-Marion from May 2, 2011, until his transfer to ADX-Florence on June 2, 2014.

3. Chesser has studied counter-terrorism, the science of propaganda and various ideological movements to develop and test strategies to influence people to develop Jihadi views. News media reported that websites created by Chesser have been tied to homegrown terrorism. The Federal Bureau of Investigations claimed that an article written by Chesser influenced some al Qaeda affiliates to adopt new propaganda strategies.

---

[3] At trial, Chesser presented some evidence about and referenced a policy banning group prayer in the CMU. His claims based on that policy have been addressed in a separate case, *Chesser v. Walton*, Case No. 12-cv-1198-JPG-RJD, in a judgment entered May 25, 2017. Chesser did not

4. Defendant Wendy Roal[4] was the warden at USP-Marion from March 2011 to September 30, 2012.

5. Defendant Jeffrey Walton was the warden at USP-Marion from October 2012 until October 2015.

6. As wardens, Walton and Roal were responsible for supervision and management of the entire prison. They would make weekly rounds in the CMU.

7. Defendant Robert Roloff was the supervisory chaplain at USP-Marion from December 2008 until December 2014. He worked in the Religious Services Department. A great part of his job as chaplain was to assist inmates of different faiths to practice their religion in a correctional setting.

8. Defendant Milton Neumann was a case manager in the CMU at USP-Marion at all relevant times. As a case manager, Neumann was responsible for planning programs for the inmates and preparing them for release as well as working with the BOP Counterterrorism Unit ("CTU") to scan CMU inmates' mail.

9. Defendant Henry Rivas was the intelligence research specialist for the CMU at USP-Marion from April 2008 until December 2014. One of his responsibilities was to work with the CTU to monitor CMU inmate communications and behavior.

10. Defendant Steven Cardona was a unit manager at USP-Marion from January 2012 to April 2014. As a unit manager, he oversaw the CMU, including supervising and assisting the case managers and others working in the CMU. He spent 30 minutes to an hour per day in the CMU.

_____

appeal that judgment, and the group prayer policy is not at issue in this case.

B.     Credibility Findings

The Court makes the following general credibility findings, which are further discussed or explained as necessary elsewhere in the findings of fact.

11. The Court finds the testimony of Zachary Chesser credible for the most part. His manner while testifying did not indicate deception, although some of his testimony appeared biased by his personal displeasure with certain defendants. However, Chesser testified about many things for which he did not establish a basis for personal knowledge such as, for example, the motivations of other individuals for taking certain actions or making certain statements or the knowledge that other individuals had. Additionally, his testimony was often vague, with broad, general statements, and lacked detail regarding the conduct of the particular defendants in this case. Therefore, the Court credits Chesser's testimony for the most part, but only to the extent he had personal knowledge of the facts about which he testified, his testimony was relevant to the issues remaining in this case, and his testimony did not appear tainted by bias. Additionally, the Court is skeptical of Chesser's broad, general statements that are not supported by evidence of specific instances.

12. The Court finds the testimony of Ghassan Elashi credible for the most part. His manner of testifying did not indicate deception, and much of his testimony was reasonable in light of other evidence in the case. However, his memory appeared uncertain at times and his testimony was often vague and without reference to any particular defendant's conduct. In addition, he appeared confused at times. Therefore, the Court gives his

---

[4] This defendant is now named Wendy Roal Warner. However, since the witnesses generally referred to her by the last name Roal, the Court will use that appellation in this ruling for clarity's sake.

testimony limited weight.

13. The Court finds the testimony of Stephan M. Moorer not very credible based on his demeanor while testifying. Additionally, his memory appeared faulty in light of that fact that parts of his testimony conflicted with clear testimony from numerous other credible witnesses in the case. Therefore, the Court gives his testimony very little weight.

14. The Court finds the testimony of Mohammad Zaki Amawi credible for the most part. His manner of testifying did not indicate deception, but his testimony often revealed poor memory, did not reveal a basis for his personal knowledge, and was often vague and lacking in detail regarding the conduct of the particular defendants in this case. Therefore, the Court gives his testimony limited weight.

15. The Court finds the testimony of Wali Khan Amin Shah was credible to some degree. His manner of testifying did not indicate deception. However, at times his memory appeared poor or questionable, on occasion his testimony conflicted with clear testimony from numerous other credible witnesses in the case, and he admitted he was concerned about potential repercussions from testifying in this case. Additionally, his testimony sometimes lacked a foundation for personal knowledge and was often vague and lacking in detail regarding the conduct of the particular defendants in this case. Therefore, the Court gives his testimony limited weight.

16. The Court finds the testimony of Wendy Roal credible based on her demeanor while testifying, her vast experience and judgment developed from working in the correctional system, and the reasonableness of her testimony in light of other evidence in the case. She has no interest in the outcome of this case, and her manner of testifying indicated no bias. The Court also notes she appeared forthright when she could not remember details,

which is reasonable in light of her lengthy history of encounters with many inmates in the BOP, and was careful to note when she did not have personal knowledge of a matter.

17. The Court finds the testimony of Robert Roloff credible based on his demeanor while testifying, his great knowledge and experience about religious issues in prison, and the reasonableness of his testimony in light of other evidence in the case.

18. The Court finds the testimony of Milton Neumann credible based on his demeanor while testifying and the reasonableness of his testimony in light of other evidence in the case. The Court notes he appeared forthright when he could not remember details, which is reasonable in light of his lengthy history of encounters with many inmates in the BOP.

19. The Court finds the testimony of Henry Rivas credible based on his demeanor while testifying and the reasonableness of his testimony in light of other evidence in the case.

20. The Court finds the testimony of Steven Cardona credible based on his demeanor while testifying and the reasonableness of his testimony in light of other evidence in the case and its consistency with other evidence in the case.

21. .The Court finds the testimony of Jeffrey Walton credible based on his demeanor while testifying and the reasonableness of his testimony in light of other evidence in the case. The Court notes he appeared forthright when he could not remember details, which is reasonable in light of his lengthy history of encounters with many inmates in the BOP.

C.    The CMU

22. The CMU was created by the BOP to facilitate monitoring of all CMU inmate communications within the prison and with outside parties.

23. The CMU housed approximately forty to fifty inmates whose communications were monitored because of their offenses of conviction, their contacts with or attempts to

contact victims, the commission of communication related fraud or other crimes or infractions while incarcerated, or other factors. The nature of Chesser's crimes and the suspicion that he has expertise in promoting and influencing terrorists and terrorism groups made the BOP want to monitor his communications by placing him in the CMU.

24. In the CMU, all telephone calls (except for legal calls) are prearranged and monitored by the CTU, all mail (except legal mail) is reviewed by the CTU, and surveillance cameras are used more than in other units. Nevertheless, it was impossible to monitor every conversation between CMU inmates.

25. The CMU was a self-contained prison unit that included all areas needed to house and manage prisoners including housing units; a recreation area; a dining hall; program areas for activities such as education classes and mail call; a library area; a multi-purpose room; and a special housing unit ("SHU").

     D.      Animus Toward Muslims

26. No defendant displayed any animus toward Muslim inmates because of the inmate's religion.

27. There was evidence presented that, on several occasions, various defendants offended, punished, or confiscated property from Muslim inmates. The Court does not find credible the testimony that any defendant made derogatory comments about the Muslim religion or said that Muslims worship Satan. As for the other instances, even if that evidence were credible, there was no credible evidence that the defendants' conduct was because of the inmate's religion. Nor was there any evidence that non-Muslims were treated any better in similar circumstances. Thus, those incidents do not support an inference that any defendant had any animus toward Muslims because of their religion.

E.     Foreign Language Study in the CMU (Count 5 – All Defendants)

28. On August 19, 2011, Warden Roal issued a memorandum prohibiting most foreign

language classes in the CMU.  The memorandum stated, in pertinent part:

> Effective immediately, the Education department will not offer any
> Educational classes in a foreign language, other than English as a Second
> Language (ESL).  Further, inmates will not be authorized to teach any
> classes in a foreign language.
>
> The Communications Management Unit (CMU) was designed to ensure
> that the communications of all assigned inmates could be effectively
> monitored.  Classes taught in another language inhibit the staff from
> properly monitoring what is being instructed, and therefore is a security
> concern.

Stip. Ex. 3.

29. Roal applied this policy to ban all foreign language teaching.  The other defendants

viewed the policy as banning all foreign language classes regardless of whether they were

through the Education Department.

30. Roal prohibited teaching foreign language classes because she was concerned that it

would be difficult for staff to monitor inmate communications during inmate-led foreign

language classes.

31. Roal believed her staff was enforcing the ban equally to inmates of all religions and to all

foreign languages studied.

32. Some Arabic Qurans and Arabic language materials related to reading and pronouncing

the Quran were maintained by the Religious Services Department in the CMU because

they were necessary to Muslim inmates' religious practices.  Muslim inmates were

allowed to read the Quran in Arabic for religious purposes during the two-hour time

period designated by the Religious Services Department for Muslim religious practice.

The study materials were also available to inmates in the CMU multi-purpose room when

the room was not being used for other purposes. The materials were unaffected by Roal's memorandum.

33. Prior to Roal's August 19, 2011, memorandum, inmates taught formal foreign language classes through the Education Department in the CMU, including French, Spanish and Arabic, although only Arabic was being taught through the Education Department at the precise moment Roal issued the memorandum. In addition, inmate Shah was teaching Farsi informally to another inmate at the time of the memorandum.

34. After the memorandum, all formal foreign language classes in the CMU through the Education Department stopped without regard to the faith of the inmates studying the languages or the language studied. During the weekly designated religious study period, Roloff continued to allow Muslims to read the Quran in Arabic aloud but required discussion to be in English so it could be monitored.

35. Nevertheless, Chesser and some other Muslim inmates continued to study Arabic informally and clandestinely in small groups with inmate Shah or another inmate as the teacher. Other non-Muslim inmates continued to study other foreign languages informally as well.

36. The defendants did not stop or punish any inmates participating in the continuing Arabic study because they did not detect that inmates were teaching and learning Arabic in a class.

37. Roal was not aware that groups were continuing to meet to teach foreign languages informally. She was also not aware that prison staff knew of any informal foreign language classes and failed to stop them. If she had been aware, she would have tried to stop the groups regardless of the religion of their participants. She did not selectively

enforce the language class prohibition, much less do so on the basis of religion.

38. Roloff was not aware that inmates were learning Arabic other than as permitted by self-study or during times designated by the Religious Services Department for religious practice and study. He did not selectively enforce the language class prohibition, much less on the basis of religion.

39. Rivas suspected that inmates tried to teach foreign languages informally, including Arabic, after Roal's memorandum, but he was unaware of any specific instance such that he could have done anything to enforce the memorandum. On occasion, Rivas observed Chesser and other men gathered to study Arabic but was unable to understand at the time what they were discussing. The Court does not credit Elashi's testimony that, after Roal's memorandum, Rivas came across one such group, Elashi told him they were studying Arabic, and Rivas walked away and did nothing. Rivas testified credibly that this incident occurred in an Education Department class in an Education Department classroom before Roal's memorandum and involved group study of a book approved by the prison. The Court believes Elashi was simply confused about the timing of the incident.

40. Like Rivas, Neumann suspected that inmates tried to teach foreign languages informally, including Arabic, after Roal's memorandum, but he was unaware of any specific instance such that he could have done anything to enforce the memorandum. As with Rivas, to the extent Neumann observed groups gathered to study Arabic, he did not know what they were gathered for at that time.

41. Cardona was not actively involved in enforcing Roal's memorandum regarding foreign language classes but instead relied on Rivas and Neumann, whom he supervised, to

enforce the ban.  Neither Rivas, Neumann nor any CMU inmate told Cardona that the foreign language class suspension was only being enforced against Muslim inmates learning Arabic.  Cardona was unaware of any continuing foreign language classes or any disparate treatment with respect to the foreign language class ban.

42. Inmate Victor Bout, a non-Muslim, was not prevented from studying Arabic with inmate Elashi and other inmates in plain view of cameras frequently monitored by Rivas or Neumann.  Other defendants (except Roloff) walked by while these lessons were being given.  No evidence showed the cameras in question had audio capabilities such that they would have allowed someone monitoring them to hear the conversation or that the defendants who walked by were able to detect the Arabic study.  To an observer, it looked like two people simply sitting next to each other without any indication that they were studying Arabic.  Neither Rivas nor Neumann nor any other defendant knew Bout was learning Arabic.  Chesser's testimony that it was clear from the books Bout and the teacher were reading that Bout was being taught Arabic was not credible.  The Court believes his assessment about what was obvious was unreasonable because it was speculative and tainted by his prior knowledge that Arabic was being taught.  The defendants' testimony that they did not know that Bout was being taught a foreign language was credible.

43. Inmate Kifah Jayyousi, a Muslim, and inmate Walter Bond, a non-Muslim, were not prevented from being taught Spanish by another inmate.  Sometimes they would study in front of a camera, loudly in front of a guard's office, or in front of Rivas, Neumann and Cardona.

44. Inmate Tariq Musawwir, a Muslim, was not prevented from being taught Farsi by inmate

Shah.

45. No defendant stopped the lessons to Jayyousi, Bond, or Musawwir because no defendant knew the lessons were occurring. Again, Chesser's assessment that the classes were obvious is not based on personal knowledge about what the defendants actually knew at the time and was less credible than the testimony from Rivas, Neumann and Cardona that they did not know foreign language classes were occurring.

46. The Court heard no credible testimony that any defendant purposefully permitted non-Muslim inmates, but not Muslim inmates, to engage in informal foreign language classes.

47. When Warden Walton arrived at USP-Marion in October 2012, he was not aware that any inmate-led foreign language classes were occurring in the CMU.

48. Shortly after Walton's arrival, he instituted a review of Roal's foreign language class prohibition. He eventually altered the foreign language policy to allow more self-study but still prohibited teaching foreign language classes because he believed allowing larger groups of inmates to congregate for foreign language classes posed a greater security risk than self-study.

49. Walton was not actively involved in enforcing Roal's memorandum or his own policy regarding foreign language classes but instead relied on other prison staff to do so. He was not aware that the policies were being enforced differently against Muslims, much less that any different treatment was based on religion.

50. None of the defendants disciplined Chesser for studying Arabic, but he was told he could not participate in Arabic classes and was threatened with discipline if he did so. Elashi's testimony that Chesser was placed in the SHU for studying Arabic is not credible because Elashi had no personal knowledge of the reasons for Chesser's placement in the SHU,

and Chesser denied that studying Arabic was a reason for his SHU placement.

F.    Short Pants (Count 23 - Defendants Roal, Neumann, Rivas and Roloff)

51. The standard BOP inmate uniform was khaki-colored pants, a khaki-colored shirt over a
    T-shirt and either work boots or soft-soled shoes.  The pants issued to each inmate were
    of a length such that they fell below their ankles around the top of an ordinary shoe.
    Inmates were not permitted to alter their uniforms.

52. Inmates were generally required to wear their uniforms in a certain way:  shirt-tails
    tucked in, the waist of the pants at waist level without sagging, and pant legs unrolled.
    This requirement generally applied during the normal business day, which was typically
    from 7:30 a.m. to 4:00 p.m., while inmates were transiting in the hallways, in program
    areas, on work assignments and participating in meals.

53. Although there is no written policy requiring inmates to wear their uniforms in a certain
    way, staff explained to inmates in orientation on their arrival at USP-Marion the proper
    way to wear their uniforms.

54. Muslim inmates in the BOP attempted to wear short pants or roll their pants legs up
    above their ankles because of their religious tenets calling for short pants, but BOP
    Program Statement P5360.09 regarding Religious Beliefs and Practices provided in the
    Ceremonial Clothing provision, "Islamic inmates may not hem or wear their pants above
    the ankles."  Stip. Ex. 1, ¶ 14(b)(4).  One of the purposes of Program Statement P5360.09
    was to state what special religious accommodations would be provided for certain faiths
    where the accommodation would not normally be allowed under prison rules and to state
    the limitations on those accommodations.  It specified what accommodations would be
    made for Muslim inmates but that deviating from the regular uniform policy regarding

pants length was not one of those accommodations.

55. Program Statement P5360.09 ¶ 14(b)(4) was not a dress rule purposefully designed to regulate Muslim dress differently than other inmates' dress but an express statement that Muslims were not exempt from the dress rules applicable to other inmates with regard to pants length.

56. Non-Muslim inmates in the CMU also attempted to roll their pants legs up, although not with the same frequency as Muslim inmates.

57. In certain areas of the prison, some staff, including Roloff, Neumann and Rivas, took a relaxed approach to enforcement of rules regarding the appearance of the uniform. When inmates were in their cells, housing units, or recreation areas, they were not expected to be in proper uniform. For example, they were generally allowed to roll their pants above their ankles in the CMU housing unit or dress in clothing appropriate to exercise in the recreation area. As a result, the uniform requirements in the CMU housing unit were generally not strictly enforced except during the prison administrators' weekly visits to the unit.

58. Warden Roal strictly enforced the dress rules, including Program Statement P5360.09, even in the housing units. If she encountered an inmate not wearing his uniform as required, she would instruct him to correct it on the spot or confiscate the clothing item if it could not be corrected immediately. She also would not allow inmates to roll up their sweat pants. She testified credibly that she took this approach with all inmates regardless of their religion. The Court bases this credibility determination on her demeanor while testifying, the reasonableness of the testimony itself in light of her general approach to running USP-Marion in an orderly and disciplined manner, and the consistency of her

testimony with testimony from other witnesses.

59. Roal was aware that staff made some exceptions to the dress rules for inmates within their housing units or going to/from or participating in recreation. She viewed those as more relaxed times where inmates could be more comfortable. She accepted this type of enforcement and believed that the exceptions were not based on an inmate's religious beliefs.

60. On a number of occasions, Roal ordered Chesser to unroll his pants, even in the CMU housing unit. Her instruction was consistent with her ordinary, strict approach to enforcing the dress rules and was not motivated in any way by Chesser's religion.

61. If Roloff, Neumann or Rivas encountered an inmate not wearing his uniform as required at the appropriate times and areas, he would instruct the inmate to correct it on the spot or confiscate the clothing item if the problem could not be corrected immediately. Each testified credibly that he took this approach with all inmates without regard to their religion.

62. Neumann would issue a disciplinary ticket only if he had to correct the problem repeatedly. He issued one disciplinary ticket to inmate Ehsanul Sadequee, a Muslim, for entering the program area with his pants rolled above his ankles.

63. Roloff did not strictly enforce the dress policy during religious services because he did not want to discourage religious participation.

64. When he instructed Muslim inmates to correct their pants length, Roloff would cite Program Statement P5360.09 because it was a clear statement of the policy for Muslims regarding pants length. He did not cite Program Statement P5360.09 regarding pants length to non-Muslims because the pants length provision did not apply to them, although

he enforced the dress policy regarding pants length against Muslim and non-Muslim inmates the same way without regard to an inmate's religion.

65. Rivas and Neumann regularly told Chesser to unroll his pants in the program area when he wore them rolled up. Chesser's testimony that Rivas ordered Chesser to unroll his pants during meals once in the front of the entire unit to embarrass him was not credible in light of Rivas's credible testimony to the contrary and the unreasonableness of that alleged conduct in light of Rivas's rare appearance in the dining hall and his personal preference for correcting inmates in a less public setting.

66. Roloff asked Chesser to roll down his pants repeatedly.

67. No defendant disciplined Chesser for wearing his pants above his ankles.

68. Inmate Edward Brown, a non-Muslim, often wore sweat pants rolled above his knees. On numerous occasions, Rivas and Neumann instructed Brown to unroll his pants when he was in the program area but not when he was in the housing unit or in the recreation area. The only time Roloff saw Brown with his pants rolled up was when he was in the housing unit or the recreation area, so he did not ask him to roll his pants down. Roal did not see Brown with his pants rolled up outside of recreation. Amawi's testimony that she did was speculative. Chesser's testimony that she did was not credible for the reasons set forth earlier and because it was inconsistent with Roal's credible testimony that she would tolerate no exceptions to the dress rules.

69. Inmate Charles Friedman, a non-Muslim, wore sweatpants that he had shortened and altered in other ways. Rivas confiscated them from him.

70. Generally, the testimony that the prohibition on short pants was enforced unequally against Muslims but not against other inmates was vague as to the circumstances of the

alleged unequal application or the identity of the inmate or the defendant allegedly

implementing the policy.  Thus, it was inadequate to show by a preponderance of the

evidence that any particular defendant treated any non-Muslim inmate similarly situated

to Chesser any better than that defendant treated Chesser or that any such disparate

treatment was because of Chesser's religion.

71. To the extent that there was any lapse in enforcement of the policy regarding pants

length, it was not because of the religion of the inmate violating the policy but because of

the impossibility of the defendants' enforcing all policies all of the time against all

inmates.  The defendants intended in good faith to enforce the pants length policy against

all inmates equally regardless of their religion and did not intend to enforce the policy

differently to any inmate because of the inmate's religion.

72. Chesser was allowed to obtain short pants in 2012.

73. Program Statement P5360.09 later changed to remove the express prohibition on short

pants as a religious accommodation for Muslims.

## III.    Conclusions of Law

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

The Fifth Amendment provides that "no person . . . shall . . . be deprived of life, liberty,

or property, without due process of law."  U.S. Const. amend. V.  The Fifth Amendment's

guarantee of due process "contains an equal protection component prohibiting the United States

from invidiously discriminating between individuals or groups."  *Washington v. Davis*, 426 U.S.

229, 239 (1976).  The Supreme Court has allowed *Bivens* actions to redress federal equal

protection violations. *See Davis v. Passman,* 442 U.S. 228 (1979).[5]

In order to prove an equal protection claim, a plaintiff must show that a state actor has purposefully treated him differently from persons not in his protected group. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington*, 426 U.S. at 239-42; *see City of Cuyahoga Falls v. Buckeye Comm'y Hope Found.*, 538 U.S. 188, 194 (2003). The plaintiff must prove a defendant acted with a discriminatory purpose. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-541 (1993) (opinion of Kennedy, J.); *Washington*, 426 U.S. at 240. The plaintiff must show more than "intent as volition or intent as awareness of consequences." *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 279 (1979). He must show the defendant acted "at least in part 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Id.* Where the reason for the different treatment is not purposeful discrimination, an adverse impact will not alone support a finding of purposeful discrimination. *See Iqbal*, 556 U.S. at 681-82 (harsh conditions of detention of post-9/11 terrorism suspects had an adverse impact on Muslims was "consistent with" purposeful discrimination but, in light of other neutral, nondiscriminatory explanations for the detention—arresting suspected terrorists—did not plausibly suggest

---

[5] The Court notes that the defendants discuss in their proposed conclusions of law the question of whether a *Bivens* remedy exists for the rights Chesser sought to enforce at trial. Although this question was raised by the defendants in a motion for summary judgment in an effort to defeat First Amendment claims (Doc. 112), the one paragraph in the defendants' brief did not present a well-developed challenge and was therefore rejected (Docs. 214 & 223). The argument has never been made in this case with respect to Chesser's equal protection claims until now, and the issue was not included as a disputed legal issue in the Final Pretrial Order (Doc. 299), which defines and limits the issues to be decided at trial, *see Gorlikowski v. Tolbert,* 52 F.3d 1439, 1443-44 (7th Cir. 1995). Furthermore, the defendants did not seek to amend the Final Pretrial Order after the Supreme Court's June 19, 2017, decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), which discussed the scope of the *Bivens* remedy, and they did not include the issue in their July 14, 20017, trial brief (Doc. 235). The Court declines to address the issue now based

purposeful discrimination on the basis of religion).

Because vicarious liability is inapplicable to *Bivens* suits, a defendant cannot be held liable for a constitutional violation unless he was personally involved in the deprivation. Each defendant must have intended to discriminate on the basis of religion before he or she can be liable for a purposeful discrimination equal protection violation. *Iqbal*, 556 U.S. at 676-77; *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010). Simply knowing of another's intentional discrimination and ignoring it or condoning it is not enough after *Iqbal*.

The evidence at trial showed that Chesser was not treated differently than inmates of other religions because of his religion. The evidence at trial further showed the conduct at issue was undertaken by the defendants for legitimate penological reasons and in furtherance of BOP policies.

A.     Foreign Language Study (Count 5)

Chesser has not carried his burden of proving by a preponderance of the evidence that the defendants applied the policy forbidding teaching foreign languages in the CMU in a purposefully discriminatory manner.

Roal's memorandum of August 19, 2011, did not expressly treat inmates differently based on their religion or the language they wished to study. Roal did not issue the memorandum for the purpose of treating Muslim inmates differently from other inmates. Instead, she issued the memorandum because of her reasonable and legitimate security concerns that group foreign language classes would help inmates evade the monitoring of inmate communication in the CMU. She had developed these concerns shortly after she became warden of USP-Marion in March 2011 and learned that foreign languages were being taught in the

merely on the submission of a proposed order to which Chesser has not had an opportunity to

CMU.  The fact that, at the time of Roal's memorandum, only Arabic was actively and formally being taught was a fluke and is not evidence of purposeful discrimination against Muslims. Walton's decision to maintain the language teaching ban after he became warden likewise was not for the purpose of treating Muslims different than non-Muslims but was for reasonable and legitimate security concerns.

No defendant purposefully discriminated against Muslims by enforcing the foreign language teaching ban differently against Muslims and non-Muslims.  After Roal's memorandum, all formal foreign language classes openly taught in the CMU were stopped irrespective of the language being taught or the religious preferences of the students.  The fact that only Arabic language classes were formally and actively being taught at the time of Roal's memorandum does not indicate purposeful discrimination in enforcement; had their been formal classes teaching other foreign languages, they would have been stopped as well.  The preponderance of the evidence shows the defendants did not enforce the foreign language teaching ban against Muslims because of their religion but instead because they were being taught a foreign language in violation of the ban.

Some of the defendants were aware of the possibility that informal foreign language classes may have continued in small groups, but they were not aware of any specific instance of teaching, whether by Muslims or non-Muslims.  Because they were not aware of any specific instance of teaching, they could take no action to enforce the policy against the offenders.  Had they been aware that an inmate was teaching a foreign language, the defendants would have stopped it regardless of whether the participants were Muslim or non-Muslim.  In sum, the preponderance of the evidence shows that the defendants did not allow non-Muslim inmates to

---

respond.  Accordingly, the Court declines to include the issue in its conclusions of law.

engage in foreign language study while stopping Muslim inmates or that any enforcement decision was based on an inmate's religion. The foreign language teaching ban was not enforced differently against Muslims than it was against non-Muslims.

Chesser was not disciplined in any way for participation in foreign language classes following Roal's memorandum.

In sum, the Court concludes that Chesser did not meet his burden of showing by a preponderance of the evidence that any of the defendants purposefully discriminated against him because of his religion in connection with the ban on teaching foreign languages in the CMU.

     B.     <u>Short Pants (Count 23 - Defendants Roal, Neumann, Rivas and Roloff)</u>

Chesser has not carried his burden of proving by a preponderance of the evidence that the defendants applied the rule forbidding short pants to him in a purposefully discriminatory manner.

The standard dress policy applicable to all inmates requires that pants be worn to below the ankle—without being shortened by hemming or by rolling up—during certain times and at certain places. Many USP-Marion staff members did not strictly enforce this policy outside normal inmate working hours, in the housing units, in the recreation areas, or going to or from the recreation area.

Program Statement 5630.09 expressly provides that Muslims, who often wish to wear short pants for religious reasons, are not exempt from this policy to accommodate their religious beliefs. Although Program Statement 5630.09 applies only to Muslims, it does not treat them differently from other inmates but simply clarifies that they will *not* be treated differently from other inmates with respect to pants length.

Warden Roal strictly enforced the standard dress policy, even in the housing units. To

the extent that she enforced it beyond the times and places where other USP-Marion staff members relaxed the rules—in the housing units—she did so uniformly against Muslims and non-Muslim's alike. She did not purposefully treat Muslims differently from non-Muslims with respect to the dress policy regarding pants length.

Roloff enforced the standard dress policy regarding pants length during the times and places the standard uniform was required but relaxed enforcement at other times and places. He also relaxed the rules during religious services. His implementation of the policy and relaxation of enforcement was the same for Muslims and non-Muslims. He cited Program Statement 5630.09 as a basis for enforcing the dress policy regarding pants length against Muslims but not against non-Muslims simply because it provided a textual basis for enforcement, but his enforcement was the same against all inmates irrespective of their religion.

Rivas and Neumann also enforced the standard dress policy regarding pants length during the times and places the standard uniform was required but relaxed enforcement at other times and places. Their implementation of the policy and relaxation of enforcement was the same for Muslims and non-Muslims.

To the extent the defendants failed to instruct any inmate to unroll his rolled-up pants, it was because of the time or location of the infraction, because the particular defendant did not observe the infraction, or an unintentional lapse in a good faith enforcement effort rather than because of any inmate's religious belief. That the defendants directed Muslims to correct the length of their pants more often than they directed non-Muslims to correct the length of their pants reflected the simple fact that Muslims committed more infractions because their religious beliefs called for short pants. It did not reflect animus or discrimination against Muslim inmates.

While Chesser was often instructed to lengthen his pants, he was not disciplined in any

way for wearing short pants.

In sum, the Court concludes that Chesser did not meet his burden of showing by a preponderance of the evidence that any of the defendants purposefully discriminated against him because of his religion in connection with enforcing the dress policy regarding pants length.

### C.     Conclusion

For these reasons, the Court finds Chesser has failed to prove by a preponderance of the evidence that he is entitled to judgment on his equal protection claims in Count 5 (foreign language teaching) or Count 23 (short pants).  Accordingly, it **DIRECTS** the Clerk of Court to enter judgment against Chesser and in favor of the defendants on Counts 5 and 23.

**IT IS SO ORDERED.**
**DATED:  April 2, 2018**


                                        s/ J. Phil Gilbert
                                        **J. PHIL GILBERT**
                                        **UNITED STATES DISTRICT JUDGE**